UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

RAMON S. RAMSEY,

                                               Plaintiff,

-against-

THE CITY OF NEW YORK; NEW YORK CITY
HEALTH & HOSPITALS CORP.; and COLER
GOLDWATER SPECIALTY HOSPITAL AND
NURSING FACILITY,

                                        Defendants.

------------------------------------------------------------------------ x

**DEFENDANTS'
LOCAL RULE 56.1
STATEMENT OF
UNDISPUTED FACTS**

06 CV 0173 (KMW)

        Pursuant to Rule 56.1 of the Local Civil Rules of this Court, Defendants the City of New York, New York Health and Hospitals Corporation ("HHC") and Coler Goldwater Specialty Hospital and Nursing Facility submit that the following are undisputed facts:

        1.     Ramon Ramsey ("plaintiff") is a former maintenance worker employed by HHC and identifies himself as African American.  (See Plaintiff's Complaint ¶ 7)

        2.     Plaintiff commenced his employment with HHC at Bellevue Hospital in February 1988 and was transferred to Coler-Goldwater Specialty Hospital and Nursing Facility in September 1997.  (See Defendants' Exhibit A, Transfer Notice)

        3.     As a maintenance worker, plaintiff was expected to perform job assignments which included: basic cleaning; replacement of broken window and door glass; minor repairs to masonry, woodwork, flooring, walls; minor repairs to building electrical, plumbing and heating systems; assisting in the relocation of building equipment and related duties.  (See Defendants' Exhibit B, Maintenance Worker Job Description; see also Plaintiff's Complaint ¶12)

4.    Coler-Goldwater Specialty Hospital and Nursing Facility is comprised of two locations, the Coler Facility and the Goldwater Facility. (See Defendants' Exhibit C, Plaintiff's June 20, 2006 Deposition P. 29 L. 1-6)

5.    Plaintiff was assigned to the Coler Facility under the supervision of Robert McClauglin. (See Defendants' Exhibit C, Plaintiff's June 20, 2006 Deposition, P. 29 L. 5-6, 21-25; P. 30 L. 1)

6.    On August 13, 1998, plaintiff was presented with his annual performance evaluation which stated that his performance that year was below standard and "Needs Improvement." (See Defendants' Exhibit D, Plaintiff's Performance Evaluation dated August 10, 1998) Specifically, the evaluation states, "Ramsey was informally counseled during this period for poor work performance and excessive lateness. He doesn't work safely to the point that co-workers do not want to work with him. He ignores the supervising during job assignments and cannot be relied upon…." Id.

7.    On November 12, 1998, plaintiff was issued a follow-up evaluation regarding his performance from July 30, 1998 through November 4, 1998. (See Defendants' Exhibit E, Plaintiff's Performance Evaluation dated November 10, 1998) Plaintiff was rated unsatisfactory for that period of time. Id. Amongst the other categories in his evaluation, plaintiff was found unsatisfactory in the following areas: "Addresses patients, visitors and co-workers in a courteous and respectful manner," "Responds to supervision requests and assignments in a timely manner," "Maintains a professional working relationship with other hospital personnel." Id. The evaluation further stated, "Ramsey's attitude and job performance have deteriorated further since his last review. Shortly after meeting with him to discuss and agree on means of improvement, it was back to "business as usual." He has been written up on

disciplinary charges for insubordination (pending).  Ramsey makes no worthwile contribution to the hospital." Id.

8.      In November 1998, plaintiff was transferred to Electrical Engineering Division of the Maintenance/Engineering Department at the Coler Facility, under the supervision of Gregoire Colson. (See Defendants' Exhibit C, Plaintiff's June 20, 2006 Deposition, P. 47-48)

9.      While working for Mr. Colson, plaintiff had attendance problems.  (See Defendants' Exhibit C, Plaintiff's June 20, 2006 Deposition, P. 49)

10.      In November 2002, plaintiff was transferred out of the Electrical Engineering Division to the Engineering Division.  (See Defendants' Exhibit C, Plaintiff's June 20, 2006 Deposition, P. 64)

11.      In March 2003, Joseph Cardali became plaintiff's supervisor in the Coler Engineering Department.  (See Defendants Exhibit F, Cardali Deposition P. 31-32)

12.      On March 10, 2003, Mr. Cardali submitted two reports regarding incidents involving plaintiff on March 3, 2003 and March 6, 2003. (See Defendants' Exhibit G and Exhibit H, Incident Reports dated March 10, 2003)

13.      Mr. Cardali's first report stated that, "On March 10, 2003 (sic) I asked Mr. Ramsey that (sic) what was he working on? And he stated that I was not his supervisor and he raised his voice and reinforced that he was responsible for his own work." (See Defendants' Exhibit G)  According to this report, "Mr. Harry Dockweiller – Chief Engineer had an informal counseling session notifying Mr. Ramsey that I Joseph Cardali was the repair engineer and that I was his supervisor." Id.

14.      In his second report, Mr. Cardali stated that on March 6, 2003, "At 13:30hrs I questioned Mr. Ramsey as to where he had been since 12:30 after his lunch break had

ended.  He told me that he was cleaning his car off.  He raised his voice and proceeded to tell me that I was not his supervisor and that I should mind my own business." (See Defendants' Exhibit H)

15.     On March 24, 2003, plaintiff was served with formal disciplinary charges regarding the incidents occurring on March 3 and March 6, 2003.  (See Defendants' Exhibit I, Statement of Charges dated March 24, 2003)

16.     On April 9, 2003, a Step 1A Informal Conference was held regarding the March 24, 2003 charges preferred against plaintiff.  (See Defendants' Exhibit J, Step 1A Decision dated April 9, 2003)  According to the Step 1A decision, Howard Kritz, Director of Labor Relations, plaintiff, plaintiff's union and Mr. Cardali were present, the charges were reviewed and both parties were given an opportunity to present their version of the events which transpired.  Id.  The decision by Howard Kritz, Director of Labor Relations, stated, "Based on the discussion, it appears that you must understand that Mr. Cardali is your supervisor and is responsible for the work of the staff.  In his role as supervisor, Mr. Cardali may at times, to ensure work is being done properly, stand by a worker and observe his work.  He may also decide to change the way something is being done because he believes another way is more appropriate.  Although you may believe your way is better, you must do as directed as long as the assignment is not a danger to your safety or health.  You may grieve the assignment after the job is completed if you feel the need to do so.  It is also expected that you will work with your supervisor and understand that if he is observing your work, it is part of his job…To give you the opportunity to show you understand the supervisory relationship between yourself and Mr. Cardali and the protocol regarding breaks, the charges of misconduct will be withdrawn.

However, this decision shall serve as a warning that insubordinate behavior, or inappropriate conduct towards your supervisor will not be tolerated, neither will unauthorized breaks." Id.

17.     On July 10, 2003, James Florez, a supervisor in the Engineering Department's Maintenance division, witnessed plaintiff playing pool during work hours. (See Defendants' Exhibit K, Request for Disciplinary Action dated July 10, 2003) Mr. Florez made a request for disciplinary action which stated, "This is to officially document that Ramon Ramsey has been verbally warned on two prior occasions that playing pool on company time is unacceptable.  On July 10, 2003, at 3:50PM Ramon Ramsey was again found playing pool during his scheduled shift.  Mr. Ramsey must understand that playing pool during work hours is unacceptable, and that failure to adhere to this standard will result in further disciplinary actions." Id.

18.     On September 4, 2003, Joseph Cardali prepared a request for disciplinary action charging plaintiff with insubordination and conduct unbecoming. (See Defendants' Exhibit L, Request for Disciplinary Action dated September 4, 2003)  In the request for disciplinary action, Mr. Cardali stated that, "[At] 8:15am Mr. Ramsey refused to accept job assignment from me." Id.  The request also stated, "Mr. Ramsey acts in an intemperate and abusive way towards me.  Example at 8:18am Mr. Ramsey stated "I don't want to hear it unless your dying (sic)".  "I don't care what you fucking have to say." Id.

19.     On September 9, 2003, a Step 1A informal conference was held to discuss the charge related to plaintiff's playing pool during scheduled work hours. (See Defendants' Exhibit M, Step 1A Decision dated September 30, 2003)  According to the Step 1A decision, Brian Ellis, Assistant Director of Labor Relations, plaintiff, plaintiff's union and Mr. Florez were present, the charges were reviewed and both parties were given an opportunity to present their

version of the events. Id.  At the conference, Mr. Florez stated that on two occasions he informed plaintiff that it was inappropriate to play pool during work hours.  (Id.; see also Defendants' Exhibit C, Plaintiff's June 20, 2006 Deposition, P. 87)  Mr. Florez further stated that on July 10, 2003, he went to the Patient's Recreation Room to unclog a sink drain. (See Defendants' Exhibit M) According to Mr. Florez, plaintiff was playing pool when he entered the recreation room.  Id. Additionally, the Step 1A decision stated that plaintiff admitted to playing pool during work hours, despite the fact that he was previously informed that such behavior was inappropriate.  Id. Mr. Ellis stated in his findings that, "You [plaintiff] were assigned to change the air-conditioning filters throughout the facility, but you were found playing pool by the evening tour supervisor. You were observed playing pool at approximately 3:50 p.m., forty (40) minutes before your tour ends (4:30 p.m.).  You did not deny the allegation, nor that it was discussed with you in the past. What is disturbing to the hearing officer, is the fact that I caught you playing pool during working hours and brought it to the attention of your department head and his assistant, which they discussed with you and your immediate supervisor.  Although, you were spoken to on several occasions about playing pool during work hours, not only by your supervisors but also by your department head, you continue to defy a directive as well as proper work ethics and professionalism standards.  Even during the informal conference you demonstrated a lack of remorse for your action and contempt for addressing this matter with you.   Based on a preponderance of credible evidence the charge of misconduct is substantiated." Id.  As a result, the recommended penalty was a 3 day suspension. Id.

20.    On September 25, 2003, Harry Dockweiller, the senior stationary engineer and one of plaintiff's supervisors, made a request for disciplinary action against plaintiff which stated that, "Mr. Cardali, the maintenance engineer, was giving out the work at about 8:20.

Before Mr. Cardali could complete the instructions, Mr. Ramsey walked out of the office.  I paged him and he did not respond.  Mr. Ramsey has stated time and time again that he doesn't speak to Mr. Cardali.  Mr. Cardali is the Maintenance Engineer in charge of maintenance.  If Mr. Ramsey will not speak to Mr. Cardali, then he is in the wrong department."  (See Defendants' Exhibit N, Request for Disciplinary Action by Harry Dockweiler dated September 25, 2003)

21.     On September 25, 2003, Mr. Cardali made a request for disciplinary action with respect to plaintiff conduct. (See Defendants' Exhibit O, Request for Disciplinary Action by Joseph Cardali dated September 25, 2003)  In his request, he stated, "Mr. Ramsey ignored my work instructions and walked out of the Engineering Office while I was explaining his duties for the day at 0820 hrs.  "Note" for the safety and well being of all our patients, residents, employees I believe Mr. Ramsey has to talk to me.  Mr. Ramsey failed to answer his pager 5 times between the time 0821 and 0908.  Mr. Ramsey called the Engineer's Office from his cell phone #9175442815 and when I answered he hung up.  At approximately 0900 Mr. Ramsey called and stated "He new his job and I was "short" again.  I asked Mr. Ramsey to stop being disrespectful and pay attention as I was asked by the Chief to make sure all equipment info was updated for entry in our new computer system at which point Mr. Ramsey said he had it covered and hung up."  Id.

22.     On September 25, 2003, Andrew Mongiardo, Director of Engineering and Maintenance at Coler-Goldwater Hospital, was informed of the incidents which transpired on that day by Mr. Cardali and Mr. Dockweiller.  (See Defendants' Exhibit P, Memorandum dated September 25, 2003)  As a result of these reports, Mr. Mongirado suspended plaintiff effective September 25, 2003. Id.  In a memorandum, Mr. Mongiardo stated, "After discussing the incident with Mr. Dockweiller, Sr. Stationary Engineer and Mr. Cardali, Stationary Engineer, I

felt that Mr. Ramsey was insubordinate, uncooperative and disruptive to the department and he abandoned his post." Id. Accordingly, plaintiff was suspended without pay from September 25, 2003 and returned to duty on October 15, 2003. (See Defendants' Exhibit Q, Memorandum dated October 17, 2003)

23.    On November 7, 2003, Mr. Cardali submitted a request for disciplinary action with respect to plaintiff's actions that day. (See Defendants' Exhibit R, Request for Disciplinary Action dated November 7, 2003) Mr. Cardali submitted two charges, the first charge stated, "Dereliction of duty at 9;30am (sic) I found Mr. Ramsey was sitting down writing personal paper work. I asked Mr. Ramsey what units he was servicing he stated he didn't start yet. It was 9;30am (sic) Mr. Ramsey also stated that it was none of my business. Note- work assignments are given out at 8;15am (sic) break is at 10;00am (sic)." Id. The second charge stated, "Abandonment of post. Mr. Ramsey was sitting down at a table in the conference room A11-7. He was supposed to be servicing HVAC wall units in conference room." Id.

24.    On November 10, 2003, Mr. Cardali issued another request for disciplinary action with respect to plaintiff's conduct. (See Defendants' Exhibit S, Request for Disciplinary Action dated November 10, 2003) Mr. Cardali's charge stated, "Insubordination- Mr. Ramsey continues to ignore my directives. Mr. Ramsey continues to walk away from me when I'm speaking to him." Id.

25.    On December 1, 2003, Mr. Cardali was observing personnel for the purpose of drafting performance evaluations. (See Defendants' Exhibit F, Cardali Deposition P. 110) On that morning, he was scheduled to observe plaintiff. Id. According to Mr. Cardali, plaintiff was insubordinate during the observation and called him a jackass. (See Defendants' Exhibit F, Cardali Deposition P. 111) Plaintiff admitted that he referred to Mr. Cardali as a

jackass in front of one of the patients while he was being observed. (See Exhibit C, Plaintiff's Deposition P. 119)

      26.    Later that day, Mr. Cardali issued requests for disciplinary action with respect to plaintiff's conduct on December 1, 2003. (See Defendants' Exhibit T, Request for Disciplinary Action dated December 1, 2003)   Mr. Cardali's first charge stated, "Insubordination: Mr. Ramsey disassembled a vacuum cleaner on the ward A11 and left the power head and filter assembly on the floor outside the access doors to A11.  This was done after I expressly asked him to bring it with him." Id.  The second charge stated, "Insubordination: Mr. Ramsey refuses to provide me with a list of completed room HVAC request by me numerous times." Id.  The third charge stated, "Abandonment of post from 10:40 to 11:15hrs Mr. Ramsey left room A11-23 where he was working and proceeded to take his tools and a vacuum cleaner to the Chief Engineers office then to the Eng/Mnt office.  Mr. Ramsey was directed by me and the Chief Engineer to return to work, instead Mr. Ramsey chose to carry on a conversation with Mr. John Brown in the entrance of the Receiving Department." Id.  The fourth charge stated, "Insubordination: Mr. Ramsey continues to use intemperate language when speaking to me.  He refused to reply to me when work assignments are handed out." Id.

      27.    On December 2, 2003, Brian Ellis, Assistant Director of Labor Relations, suspended plaintiff because of his actions/conduct during that week.  (See Defendants' Exhibit U, Memorandum dated December 2, 2003)

      28.    On January 6, 2004, plaintiff returned to duty.  (See Defendants' Exhibit V, Memorandum dated January 8, 2004)

      29.    On January 26, 2004, Mr. Cardali issued a request for disciplinary action with respect to plaintiff's conduct on that day.  (See Defendants' Exhibit W, Request for

Disciplinary Action dated January 26, 2004) In the first charge, Mr. Cardali stated, "Abandonment of Post – At approximately 1030 hours Mr. Ramsey was directed by me to bring two bags of absorbent to B Building basement Mech Equipment room and to shape up and sweep B basement with Rico Tadique. At approximately 1320 hrs I observed Mr. Ramsey engaged in a conversation in the 1st floor hallway. Upon investigation Mr. Tadique said Mr. Ramsey never returned after lunch which ended at 12:30pm." Id. In the second charge, Mr. Cardali stated, "Mr. Ramsey stated he's not coming back to me his supervisor for work. Mr. Ramsey continues to be argumentative and belligerent." Id.

30.     On January 27, 2004, Mr. Cardali issued a request for disciplinary action against plaintiff for "conduct unbecoming."   (See Defendants' Exhibit X, Request for Disciplinary Action dated January 27, 2004)  In his request, Mr. Cardali stated, "Mr. Ramsey refused to acknowledge me after I explained his work assignment to him and when I turned to leave Mr. Ramsey told me "To Fuck Myself" this was witnessed by Mr. Richard Goring." Id.

31.     On January 29, 2004, a Step IA informal conference was held to discuss the charges brought against plaintiff from November 7, 2003 through January 27, 2004. (See Defendants' Exhibit Y, Step 1A Decision dated March 15, 2004)  According to the Step IA decision, Brian Ellis, Assistant Director of Labor Relations, plaintiff, plaintiff's union and Mr. Cardali were present, the charges were reviewed and both parties were given an opportunity to present their version of the events which transpired. Id. At the conference, plaintiff requested to be transferred to a different department. Id. (Defendants' Exhibit C, Plaintiff's Deposition P. 6) Moreover, in the decision, Mr. Ellis substantiated the charges and recommended plaintiff's termination. Id. Mr. Ellis further stated, "Your behavior is not conducive nor productive to the overall functioning of the department.  Your lack of communication and interaction with your

supervisors and manager leads the hearing officer to believe that you have no desire to maintain your employment. Accordingly, it is recommended that you be terminated from your position as a Maintenance Worker." Id.

32.     On February 12, 2004, plaintiff filed an administrative charge against defendant HHC alleging race discrimination. (See Defendants' Exhibit Z, Plaintiff's State Division of Human Rights Complaint dated February 12, 2004)

33.     On February 23, 2004, the Office of Administrative Trials and Hearings ("OATH") presided over a disciplinary proceeding with respect to the charges initiated against plaintiff in September 2003. (See Defendants' Exhibit AA, OATH Decision dated April 16, 2004) The hearing was held before Administrative Law Judge Kara J. Miller. Id. Plaintiff was represented by counsel, testified on his own behalf, was given an opportunity to call his own witnesses and present other evidence. Id. At the hearing, ALJ Miller recommended that plaintiff be transferred to another facility or network. (See Defendants' Exhibit F, Cardali Deposition P. 58)

34.     On April 4, 2004, Judge Miller issued a decision which stated, "Respondent [plaintiff] is suspended without pay for twenty-one days for being insubordinate by initially refusing to perform an assignment, walking out on his supervisor while being given instructions, and refusing to respond to pages." Id. She further stated, "Respondent's behavior on September 4 and 25, 2003 was insubordinate. Moreover, his refusal to respond to his supervisor's page was not only insubordinate, but potentially dangerous. In a hospital environment, communication is vital to the safety of the patients, employees, and visitors. If an emergency had occurred, respondent would have been unable to attend to the problem because of his refusal to communicate with his superiors. Respondent's disciplinary history reflects a

pattern of conduct similar to that proven here. Respondent recently received a warning for insubordinate behavior and a three day suspension for being absent without authority being absent without authority from an assignment. He appears to have an issue with supervision, especially from immediate supervisor, Mr. Cardali. Refusing assignments and failing to communicate with supervisors prevents necessary work from being done in an orderly and efficient manner and disrupts the overall operation of the hospital. Respondent should be discouraged from continuing this disruptive pattern of behavior. As such, the penalty should be assessed in light of respondent's past history and as a deterrent to further insubordination. Accordingly, I recommend that respondent be suspended for twenty-one days without pay." Id.

35. On May 18, 2004, plaintiff was transferred to the Goldwater Facility and Dennis Galanakis was assigned to be his supervisor. (See Defendants' Exhibit BB, Memorandum dated May 13, 2004)

36. On May 19, 2004, when plaintiff arrived at the Goldwater Facility, he brought his own personal tools. (See Defendants' Exhibit CC, Letter to Labor Relations dated May 19, 2004) Mr. Galanakis asked plaintiff for an inventory of the tools and a key to the tool box for the purpose of ensuring that the facility tools do not get mixed up with plaintiff's tools. (Id.; see also Exhibit DD, Galanakis Deposition P. 35) In his letter to Mr. Ellis, Mr. Galanakis stated that plaintiff refused to give him the keys and a written inventory, accused him of trying to steal his tools and told him, "I've butted heads with bigger bosses and they lost, don't even try, Hitler is dead a long time ago." Id.

37. On May 20, 2004, Mr. Galanakis wrote another letter discussing a meeting that was held with respect to the issue of plaintiff's tools. (See Defendants' Exhibit EE, Letter to Labor Relations dated May 20, 2004) According to the letter, it was decided that plaintiff would

- 12 -

take his tools home and utilize the facility's tools at work.  Id.  Mr. Galanakis stated in his letter

that, "I assigned work to Mr. Ramsey in B Bldg.  Mr. Ramsey began to leave the shop with his

own personal tools.  When I questioned him as to what he was doing, explaining it was necessary

to use only the facilities tools, he replied, "I don't see any girl so why was I acting like a bitch –

and leave me the fuck alone.  Mr. Ramsey also said "Remember Hitler got killed."  Mr. Ramsey

then left the job to go to the B Bldg. with his personal tools." Id.

38.     On May 21, 2004, Mr. Galanakis wrote another letter to labor relations

detailing events which transpired with respect to plaintiff on that date. (See Defendants' Exhibit

FF, Letter to Labor Relations dated May 21, 2004)  In his letter, Mr. Galanakis stated that

plaintiff requested to go to an appointment for an X-ray, but refused to provide him with a

referral form. Id. According to Mr. Galanakis, plaintiff became angry and responded to his

request by stating, "I've killed other midgets like you and if you think you are going to

intimidate me I'm going to write you up faster than your fucking hair turns gray." Id.  Mr.

Galanakis then referred the matter to labor relations.  Id.  After labor relations was apprised of

this incident, plaintiff was suspended.  (See Defendants' Exhibit GG, Memorandum dated May

21, 2004)

39.     On June 19, 2004, plaintiff returned to pay status.  (See Defendants'

Exhibit HH, Memorandum dated June 25, 2004)

40.     On July 7, 2004, plaintiff filed an administrative charge with the State

Division of Human Rights alleging retaliation.  (See Exhibit II, State Division of Human Rights

July 7, 2004 Administrative Charge)

41.     On July 20, 2004, a Step 1A informal conference was held to discuss

charges preferred against plaintiff in February and May 2004. (See Defendants' Exhibit JJ, Step

1A Conference dated January 16, 2005)   According to the Step 1A decision, Brian Ellis, Assistant Director of Labor Relations, plaintiff, Mr. Galankis, and representatives from plaintiff's union were present, the charges were reviewed and both parties were given an opportunity to present their version of the events.  Id. The hearing officer substantiated the charges against plaintiff and stated in the decision that, "During the informal conference you and your union representative contested the charges of misconduct. Your work in the Maintenance/Engineering Department was changed, which was suggested by the Administrative Law Judge at OATH.  You were changed from the Coler Campus to the Goldwater Campus to the General Repair Shop within the Maintenance/Engineering Department.  Your new supervisor was attempting to do his job as your supervisor, which was obstructed by your behavior.  Your supervisor requested that you inventory your personal tools, which you made every attempt to resist.  He issued you a directive no to use your tool truck until an inventory was completed. You made threats toward him and used your tools anyway.  You exhibited uncooperative and unprofessional conduct toward your supervisor as well as made threatening comments to him in the presence of others.  When your supervisor attempted to talk to you, you ignore him as if he does not exist.  Your complete lack of communication and respect for your supervisor, who is responsible for the daily managing of the department is unacceptable.  There is no difference in your behavior and actions with your previous supervisors and your current supervisor.  Your actions are a threat to the safety of the patients /residents, staff and visitors." Id.  In the decision, the hearing officer noted that Mr. Nick Bonet corroborated Mr. Galanakis' version of the events which transpired on May 21, 2004 and added that he heard plaintiff call Mr. Galanakis a "dick" that day. Id.

42.     On July 21, 2004, Mr. Galanakis made a request for discipline regarding plaintiff's conduct. (See Defendants' Exhibit KK, Request for Disciplinary Action and Letter to Labor Relations dated July 21, 2004) In his request for disciplinary action, Mr. Galanakis stated, "Charge 1: On 7/21/04 you acted in an inappropriate, disrespectful and uncooperative manner refusing to speak to me when asked 3 times at 8:20 AM as to why you were sitting in the maintenance office and had not reported to the shop for duty.  Charge #2: On 7/21/04 you were insubordinate when you refused to use the facilities tool truck.  Instead you left with your own tool truck ignoring my directive.  Later at 3:45 pm when asked for the truck key you refused to give it to me.  You stated that I did not need that key because later he would be removing papers from the truck when it got to Coler.  Charge #3: On 7/21/04 at 3:45 pm I requested you write down the time on your work order tickets the time it took to complete each one.  You replied "You do it yourself" I answered you're the one who did the job so you put down the time.  You then wrote 8hrs for each ticket and threw them on my desk." Id.

43.     On July 22, 2004, plaintiff was issued a memorandum informing him that he was suspended from duty because of his conduct on July 21, 2004.  (See Defendants' Exhibit LL, Memorandum dated July 22, 2004)

44.     On August 23, 2004, plaintiff returned to duty at the Goldwater facility.  (See Defendants' Exhibit MM, Correspondence dated August 20, 2004)

45.     On September 7, 2004, Mr. Galanakis wrote a letter to Labor Relations regarding plaintiff's conduct. (See Defendants' NN, Correspondence dated September 7, 2004) In his letter, Mr. Galanakis stated that after informing plaintiff that he was late for work, plaintiff responded by stating, "You're a midget" – "You're nothing but a maintenance worker" – "Blow

it out of your ass" – "You smell every time you go upstairs to Brian" … "I don't need your fucking help and shut the fuck up." Id.

46.     On September 8, 2004, Mr. Galanakis wrote a letter to Labor Relations which stated that plaintiff had acted erratically and left work early without prior authorization. (See Defendants' OO, Correspondence dated September 8, 2004)

47.     On September 17, 2004, Mr. Galanakis wrote a letter to Labor Relations and submitted a request for disciplinary action which stated that plaintiff failed to communicate with him when asked where he was between 3:45 PM and 4:30 PM that afternoon. (See Defendants' Exhibit PP, Correspondence dated September 17, 2004; see also Exhibit QQ, Request for Disciplinary Action dated September 17, 2004)

48.     On October 4, 2004, Mr. Galanakis wrote a letter to Labor Relations which stated that plaintiff refused to speak to him regarding work related issues. (See Defendants' Exhibit RR, Correspondence dated October 4, 2004)

49.     On October 5, 2004, plaintiff was issued a memorandum which stated that he was suspended because of his insubordinate behavior. (See Defendants' SS, Memorandum dated October 5, 2004)

50.     On November 23, 2004, a Step 1A informal conference was held to discuss the charges preferred against plaintiff in September 2004. (See Defendants' Exhibit TT, Step 1A Conference dated January 25, 2005) In the decision, the hearing officer stated, "The hearing requested your presence in Human Resources to explain the chain of command within your department, for which you were extremely adamant and defiant when you refused to appear. Your business agent, shop steward and myself contacted you and told you that the nature of the meeting was non-disciplinary. You maintained your stance. You have exhibited a

consistent pattern of inappropriate and unprofessional conduct towards anyone and everyone, which includes a lack of respect and courtesy. You show no remorse for your action, which suggest you shall not change your behavior. It is obvious by your behavior that you lack the understanding/comprehension the affect this type of conduct have on the moral of the staff and patient services. You consistently undermine the authority of your supervisor at every opportunity and your action is disruptive, unprofessional and beyond reproach. Based on the preponderance of credible evidence the charges of misconduct are substantiated." Id.

      51. On December 6, 2004, plaintiff was returned to duty. (See Defendants' UU, Correspondence dated November 30, 2004)

      52. On December 9, 2004, Vivian Koroma wrote a letter to Labor Relations complaining about plaintiff's behavior in the Goldwater Auditorium on that date. (See Defendants' Exhibit VV, Correspondence dated December 9, 2004) According to Ms. Koroma, a teleconference was being conducted in the Goldwater Auditorium when plaintiff loudly entered and persisted to make loud noises. Id. Ms. Koroma asked him to leave until the broadcast was over or turn down the volume of his radio. Id. According to Ms. Koroma, plaintiff refused to do either and she was forced to ascertain his identity and contact his supervisor. Id. As a result of this incident, plaintiff was suspended from duty. (See Defendants' Exhibit WW, Memorandum dated December 9, 2004)

      53. On February 2, 2005, a Step 1A informal conference was held to address the charges brought against plaintiff in July and December 2004. (See Defendants' Exhibit XX, Step 1A Conference dated March 15, 2005) In the decision, the hearing officer stated, "Once again your behavior with your supervisor is inappropriate and unprofessional, which now you have exhibited toward another employee from another department. To add to it you falsified an

official documentation utilized by your department to track the length of time to complete a work order. Additionally, you intentionally disrupted a teleconference session in progress, which was vital to the facility's preparation for JCAHO. It is obvious by your behavior that you lack the understanding/comprehension of the effect this type of conduct has on the morale of the staff and patient services. You consistently undermine the authority of your supervisor at every opportunity and your action is disruptive, unprofessional and beyond reproach. Based on the preponderance of credible evidence the charges of misconduct are substantiated." Id.

54.     On March 30, May 2 and May 3, 2005, a hearing was held the Office of Administrative Trials and Hearings ("OATH") conducted a disciplinary proceeding with respect to the charges initiated against plaintiff from November 7, 2003 through December 9, 2004. (See Defendants' Exhibit YY, OATH Decision dated November 9, 2005) The hearing was held before Administrative Law Judge Faye Lewis. Id. Plaintiff was represented by counsel, testified on his own behalf, was given an opportunity to call his own witnesses and present other evidence. Id.

55.     On October 12, 2005, the Equal Employment Opportunity Commission ("EEOC") mailed plaintiff a "Right to Sue" letter. (See Defendants' Exhibit ZZ, Right to Sue Letter dated October 12, 2005)

56.     On June 30, 2005, the SDHR issued a decision with respect to plaintiff's February 12, 2004 administrative charge. (See Defendants' Exhibit AAA, SDHR Decision dated June 30, 2005) After conducting an investigation, the SDHR found that there was "No Probable Cause" to believe defendants engaged in any kind of wrong doing. Id.

57.     On June 30, 2005, the SDHR issued another decision with respect to plaintiff's July 7, 2004 administrative charge. (See Defendants' Exhibit BBB, SDHR Decision

dated June 30, 2005)  After conducting an investigation, the SDHR found that there was "No Probable Cause" to believe defendants engaged in any kind of wrong doing.  Id.

       58.    On November 9, 2005, ALJ Lewis issued a decision recommending plaintiff's termination. (See Defendants' Exhibit YY) In her decision, ALJ Lewis stated, "[A]s of April 16, 2004, respondent was on explicit notice from this tribunal of his obligation to communicate with and comply with directives from his supervisors, even if he dislikes those supervisors.  However, respondent's pattern of defiance continued even when he was transferred to Mr. Galanakis.  If anything, respondent's behavior worsened, as he repeatedly resorted to discourtesy, profanity, and on one occasion, threatening language, in a continuing dispute with Mr. Galanakis over whether he could use his own tools, or would provide Mr. Galanakis with an inventory of these tools … Given all these circumstances, despite respondent's lengthy tenure with the hospital and the relatively recent nature of his disciplinary history, I must conclude that, for whatever reason, respondent has determined that he does not need to acknowledge his immediate supervisors' questions or adhere to their authority.  Despite repeated efforts by Mr. Stewart and Mr. Dockweiler to talk to him, despite multiple suspensions, despite explicit language in Judge Miller's decision in April 2004, respondent has continued on a course of conduct that is insubordinate and disrespectful.  I have no reason to believe that respondent would deviate from this course of conduct, and hence am left with no choice but to recommend that respondent be terminated from his employment." Id.

59.    On December 9, 2005, HHC adopted the ALJ Lewis' Report and Recommendation and terminated plaintiff's employment.   (See Defendants' Exhibit CCC, Correspondence dated December 9, 2005)

Dated:        New York, New York
              March 6, 2007

                           MICHAEL A.  CARDOZO
                           Corporation Counsel of the
                             City of New York
                           Attorney for Defendants
                           100 Church Street, Rm. 2-111
                           New York, New York 10007
                           (212) 788-0960

                    By:    _____
                           A. Ali Ayazi (AA7742)
                           Assistant Corporation Counsel