UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

RAMON S. RAMSEY,

              Plaintiff,

    -against-

                                  06 Cv 0173 (KMW)
                                  OPINION AND ORDER

THE CITY OF NEW YORK; CITY HEALTH &
HOSPITAL CORPORATION; and COLER
GOLDWATER SPECIALITY HOSPITAL AND
NURSING FACILITY,

              Defendants.

-------------------------------------X
WOOD, U.S.D.J.:

    Ramon S. Ramsey ("Plaintiff") brings this action against the
City of New York, City Health & Hospital Corporation, and Coler-
Goldwater Speciality Hospital and Nursing Facility (collectively
"Defendants").  Plaintiff alleges that Defendants, in violation
of Title VII, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), (1)
discriminated against him on account of his race (Count I); (2)
created a hostile work environment (Count II); and (3) retaliated
against him for filing complaints alleging discrimination (Count
III).  Plaintiff also alleges that Defendants violated 42 U.S.C.
§ 1981(Count V) and New York State Human Rights Law, Executive
Law § 291(Count VI).  Invoking New York State Civil Practice Laws
and Rules Article 78, Plaintiff seeks an order and judgment
adjudging and declaring that he has been unlawfully removed from
his job (Count VII).

Defendants move for summary judgment on all counts.  For the reasons stated below, Defendants' motion is GRANTED in its entirety.

I. **Background**

    **A. Facts**

Unless otherwise noted, the following facts are undisputed and are derived from the parties' Local Civil Rule 56.1 statements, affidavits, and submissions.[1]  To the extent that the facts are contested, all inferences are drawn in favor of the Plaintiff.

    **1. Plaintiff's Employment and Job Tasks**

Plaintiff, who is African-American, worked as a mechanic and maintenance worker for Defendant New York Health and Hospital Corporation ("HHC") for almost eighteen years, from February 1988 until his termination on December 9, 2005.  (Defendants' Rule 56.1 Statement in Support of Motion for Summary Judgment [hereinafter "Defs.' 56.1 Stmt."] ¶ 1, 2, 59.)  From September 1997 until his termination, Plaintiff was stationed at the Coler-Goldwater Speciality Hospital and Nursing Facility ("Coler-Goldwater"), one of several HHC facilities.  (Defs.'s 56.1 Stmt.

---

[1] All exhibits attached to the Declaration of Michael A. Hardy, Plaintiff's Counsel, in Opposition to Defendants' Motion for Summary Judgment are referred to herein as "Pl.'s Ex. [X]." All exhibits attached to the Declaration of A. Ali Ayazi in Support of the Defendants' Motion for Summary Judgment are referred to herein as "Defs. Ex. [X]."

¶ 2, 59.)  The Coler-Goldwater facility is comprised of two campuses, the Coler campus and the Goldwater campus.  Plaintiff worked at the Coler campus from 1997 to 2004 and then at the Goldwater campus from 2004 until he was terminated in December 2005. (Defs.'s 56.1 Stmt. ¶ 5, 35.)

At Coler-Goldwater, Plaintiff was expected to perform a range of tasks.[2]  (Defs.'s 56.1 Stmt. ¶ 3.)  Plaintiff effectively completed many of the assigned tasks.  From 1998 to 2003, Plaintiff received annual evaluations rating his performance in undertaking these assigned tasks.  (Defs. Ex. D and E; Pl. Ex. 3.)  The rating in these evaluations ranged from "unsatisfactory" to "satisfactory plus," with the vast majority of the ratings listed as "satisfactory."[3]  (Pl. Ex. 3.)  Harry Dockweiler, one of Plaintiff's senior supervisors, characterized Plaintiff as an "all right" mechanic and maintenance person who was efficient at completing his work.  (Pl. Ex. 1, at 5.)

## 2. Disciplinary Actions Taken Against Plaintiff while at the Coler Campus

Plaintiff's supervisors, including Dockweiler, expressed concerns about Plaintiff's job performance.  In August 2000 and

---

[2] These job assignments included: basic cleaning; replacing broken window and door glass; minor repairs to masonry, woodwork, flooring, and walls; minor repairs to building electrical, plumbing, and heating systems; and, assisting in the relocation of building equipment.  (Defs.'s 56.1 Stmt. ¶ 3.)

[3] The record contains no annual evaluations after 2003.

3

February 2002, supervisors counseled Plaintiff that his excessive lateness and absenteeism were problematic. (Defs.'s 56.1 Stmt. ¶ 9; Pl.'s Ex. 3.)  Defendant does not contest that he had these attendance and lateness problems; rather, he states that these problems were a result of difficulties with his car, and that his supervisors were aware at the time that he was trying to obtain a more reliable vehicle. (Plaintiff's Response to 56.1 Stmt. ("Pl.'s 56.1 Stmt.") ¶ 9).

In March 2003, Joseph Cardali, a white man, became Plaintiff's supervisor.[4] (Pl.'s 56.1 Stmt. ¶ 11.)  Around this time, the number of requests for disciplinary action to be taken against Plaintiff increased considerably.

On July 10, 2003, James Florez, one of the supervisors in the Engineering Department's Maintenance Division at the Coler campus, witnessed Plaintiff playing pool during work hours. (Defs.'s 56.1 Stmt. ¶ 17.)  Florez filed a request for disciplinary action against Plaintiff, alleging that Plaintiff had been warned twice not to play pool during his scheduled shift and nonetheless violated this rule on July 10, 2003. (Defs.'s 56.1 Stmt. ¶ 17.)  On September 30, 2003, an informal conference was held regarding Florez's disciplinary request. (Defs.'s 56.1 Stmt. ¶ 19.)  Plaintiff, Florez, Plaintiff's union representative, and Brian Ellis, the Assistant Director of Labor

---

[4] The record does not indicate the race and gender of Plaintiff's prior supervisors.

Relations, attended the conference.  (Defs.'s 56.1 Stmt. ¶ 19.)
Plaintiff had the opportunity to testify; he admitted that he was
playing pool during his shift, albeit briefly, and that he had
been told on prior occasions that he was not permitted to do so.
(Defs.'s 56.1 Stmt. ¶ 19; Def. Ex. M.)  Ellis, who was acting as
the hearing officer, recommended a three-day suspension.

In 2003, Cardali filed several requests for disciplinary
action against Plaintiff.  (Defs.'s 56.1 Stmt. ¶ 18; Def. Ex. M.)
Cardali alleged that on September 4, 2003, Plaintiff refused to
accept his assignment and said "I don't want to hear it unless
you're dying" and "I don't care what you fucking have to say."
(Defs.'s 56.1 Stmt. ¶ 18; Def. Ex. L.)  On September 25, 2003,
Cardali filed another request for a disciplinary action stating
that Plaintiff walked out of the room while being told his work
assignment for the day, refused to respond to his pager and hung
up the phone when he learned that Cardali was on the line.
(Defs.'s 56.1 Stmt. ¶ 21; Def. Ex. O.)  Plaintiff denies that he
made the comments or engaged in the conduct alleged by Cardali.
(Pl.'s 56.1 Stmt. ¶ 20-21).  After receiving these requests for
disciplinary action from Cardali and Dockweiler, Defendants
suspended Plaintiff from his job from September 25, 2003 to
October 15, 2003.  (Defs.'s 56.1 Stmt. ¶ 22; Defs. Ex. Q.)

Plaintiff returned to work on October 15, 2003, and in the
ensuing months, Plaintiff's supervisors filed additional requests

for disciplinary action against Plaintiff.  (Defs.'s 56.1 Stmt. ¶
23, 24; Defs. Ex. R, S.)  The most significant of these requests
stemmed from Plaintiff's conduct on December 1, 2003. (Defs.'s
56.1 Stmt. ¶ 25-26.)

On December 1, 2003, Cardali informed Plaintiff that he was
going to be observed for the day, and Cardali then commenced the
observation.[5] (Defs.'s 56.1 Stmt. ¶ 25-26; Defs. Ex. F, at 5.)
While Cardali was observing Plaintiff, Cardali entered what
Plaintiff characterized as his work area.  (Defs. Ex. F, at 5.)
When Plaintiff told Cardali that Cardali was in Plaintiff's work
area, Cardali responded, "I can stand anywhere I want to."
(Defs. Ex. F, at 5.)  Later, Plaintiff described Cardali as a
"jackass" to a patient while Cardali was outside of the patient's
room.  (Defs.'s 56.1 Stmt. ¶ 25; Pl. Ex. 12, at 5.)  While en
route to complain to Dockweiler about Cardali's behavior,
Plaintiff and Cardali started to argue about a vacuum cleaner
that Plaintiff was about to put away.  (Pl. Ex. 12, at 9-11.)  As
a result, Plaintiff left a disassembled vacuum cleaner unattended
in the hallway.  (Defs.'s 56.1 Stmt. ¶ 25; Pl. Ex. 12, at 10-11.)
On December 3, 2003, Ellis suspended Plaintiff for a month
without pay, citing Plaintiff's conduct earlier in the week.
(Defs.'s 56.1 Stmt. ¶ 27; Defs. Ex. U.)

---

[5] Dockweiler asked Cardali to observe each of Cardali's
employees while the employee was working and to report back on
"what [the employees] were doing in their specific job task."
(Defs.'s 56.1 Stmt. ¶ 25-26; Defs. Ex. F, at 5.)

### 3. Transfer to the Goldwater Campus

On January 29, 2004, an informal conference was held to address the charges brought against Plaintiff from November though January. (Defs.'s 56.1 Stmt. ¶ 31; Defs. Ex. Y.) Ellis recommended terminating Plaintiff, and rejected Plaintiff's request to be transferred to a different campus. (Defs.'s 56.1 Stmt. ¶ 31.)

On February 23, 2004, the Office of Administrative Trials and Hearings (OATH) conducted a disciplinary hearing to address these disciplinary charges. (Defs.'s 56.1 Stmt. ¶ 33; Defs. Ex. AA.) At the hearing, Plaintiff had the assistance of counsel, testified on his own behalf, and presented evidence. (Defs.'s 56.1 Stmt. ¶ 33; Defs. Ex. AA.)

On April 4, 2004, Administrative Law Judge Kara J. Miller issued a decision that focused on the disciplinary complaints lodged against Plaintiff, especially those relating to Plaintiff's refusal to communicate with his supervisors (most notably Cardali) and the challenges that his behavior created in the hospital work environment. (Defs.'s 56.1 Stmt. ¶ 34; Defs. Ex. AA.) Finding many of these complaints meritorious, Administrative Law Judge Miller recommended suspending Plaintiff for twenty-one days and transferring him from the Coler campus to the Goldwater campus. (Defs.'s 56.1 Stmt. ¶ 34; Defs. Ex. AA.) Consistent with the OATH recommendation, Plaintiff was suspended

for twenty-one days and then transferred to the Goldwater campus. (Defs.'s 56.1 Stmt. ¶ 35.)

### 4. Plaintiff's Complaints and Disciplinary Actions against Plaintiff at the Goldwater Campus

Plaintiff started working at the Goldwater campus on May 19, 2004, under the direct supervision of Dennis Galanakis. (Defs.'s 56.1 Stmt. ¶ 35.)  Plaintiff characterized Galanakis as nasty to everyone, but even nastier to him.  (Defs. Ex. 17, at 9.) According to Plaintiff, Galanakis' nasty, provocative behavior toward Plaintiff manifested itself on Plaintiff's first day at the Goldwater campus, when Galanakis questioned Plaintiff about why he was sitting in the maintenance office.[6]  Plaintiff also alleges that Galanakis unreasonably tried to prevent Plaintiff him from using his personal tools on the job.  Plaintiff's senior supervisors had given him permission to use a tool truck that he had brought over from the Coler campus.  (Pl. Ex. 16, at 5.)

---

[6] On Plaintiff's first day at the Goldwater campus, he went to the maintenance office to get his proper identification card and keys. (Pl. Ex. 17, at 10.)  The secretary in the maintenance office told Plaintiff to have a seat. (Pl. Ex. 17, at 10.) Galanakis walked in while Plaintiff was sitting down waiting for assistance. (Pl. Ex. 17, at 11.)  According to Plaintiff, Galanakis said "What are you doing in here?" (Pl. Ex. 17, at 11.) Plaintiff did not respond and Galanakis asked the question again. (Pl. Ex. 17, at 11.)  By asking the question yet again, Plaintiff claimed, "[Galanakis] tried to badger me, and I wouldn't respond to him. He could have asked the secretary.  She knew what I was sitting there for.  She didn't say anything to him." (Pl. Ex. 17, at 11.)  Plaintiff further explained, "He already knew what I was doing there.  I was coming back from suspension.  He helped to initiate [the argument]."  (Pl. Ex. 17, at 11.)

Plaintiff said that his personal tools in the tool truck were adequate for the new position.  Plaintiff did not want Galanakis to do an inventory of his tools or to require Plaintiff to use the Defendants' tools.  (Pl. Ex. 16, at 6-8.)  Galanakis was insistent that he needed to inventory the tools and filed a request for disciplinary action because Plaintiff refused to let him do so. (Pl. Ex. 16, at 6-8; Defs.'s 56.1 Stmt. ¶ 36).   Over the next few months, Galanakis and Plaintiff had several more disputes, many of which resulted in Plaintiff being suspended. (Defs.'s 56.1 Stmt. ¶ 37-51;  Pl.'s 56.1 Stmt. ¶ 37-51.)

On December 9, 2004, three days after Plaintiff had returned from his most recent suspension, Vivian Kormana filed a written complaint alleging that Plaintiff had disrupted a teleconference held in Goldwater Auditorium that day.   (Defs.'s 56.1 Stmt. ¶ 52.)  According to Kormana, Plaintiff was making loud noises and playing the radio in the auditorium while she was on a teleconference and refused to either leave the auditorium or stop the noises.  (Defs.'s 56.1 Stmt. ¶ 52.)  Kormana's letter resulted in an informal conference at which Ellis once again recommended terminating Plaintiff.[7]  (Defs.'s 56.1 Stmt. ¶ 53.)

---

[7] Administrative Law Judge Lewis found that the conduct that Kormana complained of did not rise to the level of "misconduct sanctionable under the Civil Service Law."  Defs' Ex. YY, at 16. Nonetheless, as noted below, Administrative Law Judge Lewis recommended that Plaintiff be terminated from his employment.

### 5. Plaintiff's Termination

On March 30, 2005 and May 2-3, 2005, Administrative Law Judge Faye Lewis presided over an OATH disciplinary hearing addressing the charges against Plaintiff from November to December 2004.[8]  (Defs.'s 56.1 Stmt. ¶ 54.)  On November 9, 2005, Administrative Law Judge Lewis issued a report recommending that Plaintiff be terminated from his job.  (Defs.'s 56.1 Stmt. ¶ 58.)

In this report, Administrative Law Judge Lewis noted that Plaintiff's conduct was disruptive to the work environment despite repeated warnings from Defendants that his conduct was unacceptable.  More specifically, the report stated that although Plaintiff had been told that he needed to verbally respond to his supervisors' requests with a "yes" or "no" answer, Plaintiff "has determined that he does not need to acknowledge his immediate supervisors' questions or adhere to their authority."  (Defs.'s 56.1 Stmt. ¶ 58; Defs. Ex. YY.)

Accordingly, the report recommended terminating Plaintiff from his employment at Coler-Golwater.  On December 9, 2005, Defendant HHC adopted the ALJ's recommendation and terminated Plaintiff's employment.  (Defs.'s 56.1 Stmt. ¶ 59.)

### B. Procedural History

On February 12, 2004, Plaintiff first filed a complaint with

---

[8] Consistent with the prior OATH hearing, Plaintiff was represented by counsel, testified on his own behalf, called witnesses, and presented evidence.  (Defs.'s 56.1 Stmt. ¶ 54.)

the New York State Division of Human Rights ("SDHR") and the United States Equal Opportunity Commission ("EEOC").  (Defs. Ex. Z.)  In this complaint, Plaintiff alleged that Defendants were discriminating against him on the basis of his race.  (Defs. Ex. Z.)

On July 7, 2004, Plaintiff filed a second complaint with the SHDR and EEOC.  (Defs. Ex. II.)  In this second complaint Plaintiff alleged retaliation for filing his first complaint, and alleged additional racial discrimination.  (Defs. Ex. II.)

On June 30, 2005, the SDHR issued a decision in response to Plaintiff's February 12, 2004 and July 7, 2004 complaints.  (Defs. Ex. AAA.)  The SDHR found there was no probable cause to support Plaintiff's claim that Defendants engaged in wrongdoing.  (Defs. Ex. AAA.)  The EEOC chose to adopt the SDHR's decision that there was no probable cause.  (Defs. Ex. ZZ.)  The EEOC also issued Plaintiff a right to sue letter.  (Defs. Ex. ZZ.)

On January 10, 2006, Plaintiff filed a complaint in this Court alleging that Defendants violated rights under Title VII, § 1983, and New York State law.  On August 21, 2007 after answering Plaintiff's complaint and engaging in discovery, Defendant filed the instant motion.  With the benefit of briefing from both parties, the Court considers Defendants' Motion for Summary Judgment.

11

## II. <u>Summary Judgment Standard</u>

Summary judgment is appropriate only when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>See also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Tindall v. Poultney High Sch. Dist.</u>, 414 F.3d 281, 284 (2d Cir. 2005).  "[S]ubstantive law will identify which facts are material," <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986), and a "material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u>; <u>Mitchell v. Shane</u>, 350 F.3d 39, 47 (2d Cir. 2003).

All ambiguities must be resolved, and all inferences drawn, in favor of the nonmoving party.  <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 91 (2d Cir. 2001).  But "[a] non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'"  <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 75 (2d Cir. 2005) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)).  Rather, a non-moving party "must 'set forth specific facts showing that there is a genuine issue for trial,'" <u>id.</u> (quoting Fed. R. Civ. P. 56(e)); he or she "'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events

12

is not wholly fanciful.'" Id. (quoting Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004)).

## III. **Title VII Claims**

Plaintiff raises three claims under Title VII.  He argues that he has been (1) discriminated against on account of his race, (2) subjected to a hostile work environment, and (3) retaliated against for engaging in protected activity.  The Court addresses each claim in turn.

### A. Discrimination Claim

#### 1.  Legal Standard

On a motion for summary judgment, claims of discrimination under Title VII are analyzed under the three-step burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Pursuant to this three-step analysis, a plaintiff must first establish a prima facie case of discrimination, by "introduc[ing] evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor." Holcomb v. Iona College, 521 F.3d 130, 138 (2d Cir. 2008).  A plaintiff must show: "(1) that he belonged to a protected class; (2) that he was qualified for the position he held [or to which he applied]; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory

13

intent." Id.; see also McDonnell Douglas, 411 U.S. at 802. The burden in establishing a prima facie case is "de minimis." Woodman, 411 F.3d at 76.

Once a plaintiff establishes a prima facie case, "a presumption of discrimination arises and the burden shifts to the defendant to proffer some legitimate, nondiscriminatory reason for the adverse decision or action." Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005) (quoting Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001). "This burden is only of production [of evidence], not of persuasion." Constance v. Pepsi Bottling Co., No. 03 Civ. 5009, 2007 WL 2460688, at *14 (E.D.N.Y. Aug. 24, 2007)(citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 183 (2000)). "If the defendant proffers such a reason, the presumption of discrimination created by the prima facie case drops out of the analysis." Dawson, 398 F.3d at 216.

The plaintiff must then show, by a preponderance of the evidence, that the reason the defendant has offered is pretextual, and that the adverse action was in fact motivated by discrimination. Id.; see also McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006). "[T]he ultimate burden rests with the plaintiff to offer evidence sufficient to support a reasonable inference that prohibited . . . discrimination occurred." Woodman, 411 F.3d at 76 (internal quotation marks and citations omitted).

14

In deciding the appropriateness of summary judgment, the Court must determine whether the plaintiff has presented facts pursuant to the McDonnell Douglas framework such that a reasonable jury could infer that the employer based its employment decision on an impermissible factor. See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). "The court should not consider the record solely in piecemeal fashion, . . . for a jury, in assessing whether there was impermissible discrimination and whether the defendant's proffered explanation is a pretext for such discrimination, would be entitled to view the evidence as a whole." Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000).

### 2. Analysis

Plaintiff claims that he was discriminated against based on his race, and that this discrimination led to his termination.[9]

---

[9] Plaintiff argues that Defendants had a discriminatory practice or policy. He contends that under the doctrine of continuing violation, he is therefore entitled to relief on his Title VII discrimination claims for conduct that occurred prior to April 18, 2003 (300 days before Plaintiff filed his first discrimination claim with SDHR). (Plaintiff's Memorandum of Law in Opposition to Summary Judgment, at 8.)

In advancing this argument, Plaintiff fails to recognize that the "discriminatory practice or policy" test for assessing whether Defendants had a continuing violation, has been modified by the Supreme Court. In AMTRAK v. Morgan, the Supreme Court stated that "[d]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." 536 U.S. 101, 112 (2002).

The Court applies Morgan to the case at hand. Accordingly, the Court considers events prior to April 18, 2003 only as pertinent background evidence for assessing the timely disparate treatment/unlawful termination claim (Count I) and not as timely

According to Plaintiff, Defendants discriminated against him by subjecting him to heightened scrutiny and by filing requests for disciplinary action that were largely unsubstantiated and that were motivated by discriminatory animus.  (Plaintiff's Memorandum of Law in Opposition to Summary Judgment ["Opp'n Mem."] 5.)

> ### a.  **Prima Facie Case**

The parties contest only whether Plaintiff has made a showing with respect to two of the four elements of a prima facie case of discrimination.  The parties dispute whether Plaintiff has shown that he was performing his duties satisfactorily (second element) and whether his termination occurred under circumstances giving rise to an interference of discrimination (fourth element).  The parties agree that Plaintiff was a member of a protected class (first element) and that he was subject to adverse employment action when he was terminated (third element).

Rather than deciding whether Plaintiff meets his de minimis burden of showing a prima facie case of discrimination, the Court assumes, arguendo, that Plaintiff has made such a showing. Idrees v. City of New York, 2009 U.S. Dist. LEXIS 4462, *27 (S.D.N.Y. 2009) ("Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case.").  Accordingly, the burden shifts to the Defendants

claims in and of themselves.  Morgan, 536 U.S. at 113-14.  In assessing whether Plaintiff has established a hostile work environment claim (Count II), the Court considers events prior to April 18, 2003.  Id. at 117-18.

to articulate a legitimate, non-discriminatory reason for terminating Plaintiff.

### b.  Proffered Reason for Termination

Defendants assert that they terminated Plaintiff for the reasons stated in the OATH recommendation issued on November 9, 2005.[10]  (Defs. Ex. YY.)  In the OATH recommendation, Administrate Law Judge Lewis concluded that Plaintiff was "insubordinate and disrespectful" and that his behavior had "negative ramifications upon the whole workplace."  (Defs. Ex. YY, at 21-22.)  Administrative Law Judge Lewis found that Plaintiff had been given many warnings and suspensions with the hope that Plaintiff would reform his behavior, and that Plaintiff's failure to change his workplace conduct left her with "no reason to believe that [Plaintiff] would deviate from this course of conduct" in the future.  (Defs. Ex. YY, at 22.)  She recommended terminating Plaintiff from his employment.[11]  (Defs. Ex. YY, at 22.)

Defendants' explanations for terminating Plaintiff are supported by citations to the record and represent legitimate

---

[10] Defendant HHC adopted this OATH recommendation as its basis for terminating Plaintiff. (Defs.'s 56.1 Stmt. ¶ 59.)

[11] Plaintiff notes that at the OATH hearing, Plaintiff's supervisors were not able to adequately substantiate all of their requests for disciplinary action to be taken against Plaintiff. However, Administrative Law Judge Lewis did not consider these unsubstantiated requests when she recommended that Plaintiff should be terminated.

non-discriminatory reasons for terminating Plaintiff.
Accordingly, Defendant meets its evidentiary at the second stage
of the <u>McDonnell Douglas</u> framework.

### c. Pretext

Because Defendants articulated a non-discriminatory reason
for disciplining and ultimately terminating Plaintiff, the Court
next determines whether a reasonable jury could find by a
preponderance of the evidence that Defendants' explanation for
terminating Plaintiff from his job is pretextual.  The Court
concludes that Plaintiff has provided insufficient evidence of
pretext and therefore grants Defendants' motion for summary
judgment.

Plaintiff argues that Defendants' stated reasons for
terminating him are pretextual.  Plaintiff claims that he was
singled out for scrutiny on account of his race and, therefore,
the disciplinary actions taken against him were in response to
his race, not his conduct.  (Opp'n. Mem. at 12, 15-16.)

As evidence of racial discrimination, Plaintiff cites the
fact that Administrative Law Judge told him to "grunt yes" or
"grunt no" in response to his supervisors' instructions.[12]

---

[12] At the OATH Hearing, Administrative Law Judge Lewis said:

> Respondent has been told, it seems, time and time
> again, that he merely need to say that he understood
> any directions given to him, to 'grunt yes' or 'grunt
> no.'

(Opp'n. Mem. at 16; Defs. Ex. YY, at 21.)

18

(Opp'n. Mem. at 16; Defs. Ex. YY, at 21.)  According to Plaintiff, the Administrative Law Judge's and his supervisors' "insistence that he acknowledge verbally every instruction with a 'yes' or 'no' in a civilian workplace, was race motivated and similar to someone treating a black man as a 'boy.'"  (Opp'n. Mem. at 16.)

The Administrative Law Judge's decision to describe the requested "yes" or "no" answer as a "grunt" is impolite. Nonetheless, under the circumstances, Plaintiff's characterization of the Defendants' request as racially discriminatory is speculative.  The Defendants' request, even if poorly phrased, is insufficient to establish by a preponderance of the evidence a pretext of racial discrimination.  See Woodman, 411 F.3d at 85 ("The law is well established that conclusory statements, conjecture, or speculation are inadequate to defeat a motion for summary judgment").

As further evidence of racial discrimination, Plaintiff alleges that his "white counterparts were not subject to what I was subject to." (Pl.'s Ex. 6.) He explains:

> On several occasions they voiced their opinions about stuff they didn't appreciate and in more fashion than I ever did . . . never got reprimanded, never got written up, never put on suspension. I came to the guy [Cardali] and told him, hey listen, I don't like the manner that you are talking to me, you know, it's unprofessional and you don't have to address me like that.  I deserves some degree of courtesy. Immediately I was put on 30-day suspension.

(Pl.'s Ex. 6.)

Plaintiff's allegations of disparate treatment are not supported by admissible evidence.[13] <u>Shumway v. UPS</u>, 118 F.3d 60, 65 (2d Cir. 1997) ("[S]weeping allegations unsupported by admissible evidence do not raise a genuine issue of material fact."). The Court therefore cannot credit Plaintiff's allegations when considering whether to grant summary judgment.

Viewing the evidence as a whole,[14] the Court finds that a reasonable jury could not find by a preponderance of the evidence that Defendants' stated reason for terminating Plaintiff's employment is merely pretexual and Plaintiff was instead terminated on account of his race. Defendants' motion for summary judgment on Count I is GRANTED.

## B. Hostile Work Environment Claim

### 1. Legal Standard

---

[13] Parties agree that since 2000, Peter Ferny, a white maintenance worker, was the only other employee found to violate Coler-Golwater's rules or policies. (Defs. Ex. DDD.) Ferny physically attacked a supervisor and was terminated from employment soon thereafter.

[14] The Court notes that at least three other African-American employees were at Coler-Goldwater between 2003 and 2005. (Defs. Ex. EE; Declaration of Howard Kritz.) At least two of the African-American employees had job descriptions that were comparable to Plaintiff's and had the same supervisor as Plaintiff. (Defs. Ex. EEE.) Plaintiff does not allege that any of his African-American colleagues were subject to greater scrutiny than their non-African-American colleagues. In addition, Plaintiff neither argues that Defendants made racially insensitive comments to any of his colleagues nor engaged in racially discriminatory conduct when interacting with the other African-American employees.

To defeat a motion for summary judgment on a claim of a
racially hostile work environment, Plaintiff must show that his
work environment is "permeated with discriminatory intimidation,
ridicule, and insult, that was sufficiently severe or pervasive
to alter the conditions of the victim's employment." Patterson
v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004)(internal
citations omitted).  "It is axiomatic that mistreatment at work,
whether through subjection to a hostile environment or through
such concrete deprivations as being fired or being denied a
promotion, is actionable under Title VII only when it occurs
because of . . . [a] protected characteristic," such as race.
Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001).

### 2. Analysis

Plaintiff argues that he was subject to intense scrutiny on
account of his race and that this scrutiny created a hostile work
environment.  (Opp'n Mem. at 18.)  The Court rejects Plaintiff's
hostile work environment argument.

Even if the Court were to credit Plaintiff's assertion that
he was subject to intense scrutiny, the Court nonetheless would
find Plaintiff's hostile work environment argument unavailing.
As noted earlier, Plaintiff has failed to establish that
Defendants' treatment of Plaintiff was racially motivated.

A reasonable factfinder could not find based on the evidence
presented, that Plaintiff was subject to a hostile work
environment on account of his race.  Demoret v. Zegarelli, 451

F.3d 140, 150 (2d Cir. 2006)(finding that because there is little evidence that Defendant had discriminated against Plaintiff on account of her gender, a reasonable factfinder could not find a hostile work environment). Accordingly, the Court GRANTS Defendants' motion for summary judgment on Count II.

### C.  Retaliation

#### 1. Legal Standard

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that he (1) engaged in a protected activity; (2) his employer knew that he had engaged in the protected activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between the protected activity and the adverse action, meaning that a retaliatory motive played a part in the adverse employment action.  Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 206 (2d Cir. 2006); Murray v. Visiting Nurse Servs., 528 F. Supp. 2d 257, 270 (S.D.N.Y. 2007).

A plaintiff can meet the fourth element of a prima facie case by establishing a temporal proximity between the protected conduct and the adverse employment action.  Slattery, 248 F.3d at 95.  However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  Id.

### 2.  Analysis

Plaintiff argues that he was retaliated against for engaging in protected conduct.  (Opp'n. Mem. 19)  He claims that after his July 2004 complaint with the SDHR/EEOC, "each time [he] attempted to protest his treatment, complain to his union or seek to speak with management[,] he was again suspended."  (Opp'n. Mem. 19)

The Court assumes, arguendo, that Plaintiff has made a showing as to the first three elements of the prima facie case of retaliation by establishing that (1) he engaged in protected conduct on at least two occasions,[15] (2) Defendants were aware of his protected conduct, and (3) Defendants took an adverse employment action against Plaintiff.  The Court considers the fourth element of the prima facie case of retaliation, whether Plaintiff has shown that a causal connection exists between his complaints of discrimination and his termination.

Plaintiff seeks to establish a causal connection between his protected conduct and his repeated warnings, his suspensions, and ultimately his termination by asserting a temporal proximity. (Opp'n. Mem. at 19.)

The Court finds that Plaintiff does not establish the

---

[15] On February 12, 2004, Plaintiff filed an administrative charge with the SDHR against Defendant HHC alleging race discrimination.  (Defs.' 56.1 Stmt. 32; Pl's. 56.1 Stmt. 32.)  On July 7, 2004, Plaintiff filed a complaint with the SDHR alleging retaliation. (Defs.' 56.1 Stmt. 40; Pl's. 56.1 Stmt. 40.) Plaintiff further argues that "each time plaintiff attempted to protest his treatment, complain to his union or seek to speak with management, he was again suspended."  (Opp'n. Mem. at 19.)

necessary causal connection.  An inference of retaliation does not arise when a plaintiff has been subject to a series of adverse employment actions that began before the plaintiff engaged in the protected conduct, even if the protected conduct and the adverse employment decisions were temporally proximate. Slattery, 248 F.3d at 95.  As the Court noted above, Plaintiff was subject to repeated warnings and suspensions throughout 2003; his protected conduct began in February 2004.  Accordingly, Defendants' motion for summary judgment on Count III is GRANTED.

**III. Remaining Claims**

A reasonable jury could not find that Plaintiff was subject to discrimination or a hostile work environment under Title VII. Accordingly, the Court grants Defendants' motion for summary judgment on the claims raised pursuant to 42 U.S.C. § 1981 (Count V) and the New York State Human Rights Law (Count VI) and 42 U.S.C. § 1981 (Count IV).  See Patterson, 375 F.3d at 225;  Ochei v. Coler/Goldwater Mem'l Hosp., 450 F. Supp. 2d 275, 282 (S.D.N.Y. 2006)

Because there is no basis for the Court to find that Plaintiff was unlawfully removed from his job, Defendants' motion for summary judgment on Plaintiff's claim under New York State Civil Practice Laws and Rules Article 78 (Count VII) is GRANTED.

**IV.  Conclusion**

For the reasons stated above, the Court grants Defendants' motion for summary judgment [Docket Entry #24].  The Clerk of the Court is directed to close the case.  Any pending motions are moot.

SO ORDERED.

Dated: New York, New York
       March *10* , 2009

_____
                Kimba M. Wood
        United States District Judge